UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA

                Plaintiff,                            Case No. 1:24-cr-20446

v.                                       Honorable Thomas L. Ludington
                                            United States District Judge

MATTHEW BILLS

                Defendant.

_____/

## OPINION AND ORDER DENYING DEFENDANT'S MOTION *IN LIMINE* IN PART AND GRANTING IT IN PART

On March 14, 2023, someone made four radio transmissions over the United States Coast Guard's (USCG) distress and safety channel, leading to the unnecessary launch of a Coast Guard rescue boat. Then, on March 19, 2023, the same party (the "hoax caller") made three additional radio transmissions on the Coast Guard's distress and safety channel, but the USCG did not dispatch a rescue boat this time. Based on transmission data, the Coast Guard Investigative Service (CGIS) determined that the hoax calls came from the area of 10th Street in Sebewaing, Michigan. That determination led the CGIS to interview Defendant Matthew Bills, who lived on 10th Street. This interview was recorded.

On October 19, 2023, the Government filed a Criminal Complaint, charging Defendant with knowingly and willfully communicating a false distress message to the USCG under 14 U.S.C. § 521, and making false statements under 18 U.S.C. § 1001. On August 14, 2024, Defendant was indicted by a grand jury on two counts of violating 14 U.S.C. § 521(c) by communicating a false distress message to the USCG.

On June 20, 2025, Defendant filed a motion *in limine* to prevent the testimony of the Government's opinion witness, Dr. Rita Singh. Dr. Singh is a speech and voice research professor at Carnegie Mellon University who conducted a voice analysis of the hoax call. After her analysis, Dr. Singh determined that Defendant's voice—captured during his conversation with the CGIS—matched the voice from the hoax calls. Over the course of three separate days, this Court conducted a *Daubert* hearing to determine the admissibility of Dr. Singh's testimony. For the reasons explained below, Defendant's Motion *in limine* will be denied in part and granted in part.

## I.

## A.

On March 14, 2023, the Coast Guard Sector Detroit Command Center ("Detroit Command Center") received four radio transmissions containing a male voice over very high frequency (VHS) Channel 16[1] during a twelve-minute span. ECF No. 1 at PageID.3–4. Approximately three minutes later, a distress call was made from what appeared to be the same unknown male voice. *Id*. The distress call stated, "I'm like, oh my God, there's a man in the water taken on, Bay Yacht Club, ah shit." *Id*. The Officer on Watch for the Detroit Command Center requested a vessel position, but the caller did not reply. *Id*. Based on this transmission, the Detroit Command Center declared the transmission a distress situation and prepared to direct Coast Guard rescue assets to the Bay Yacht Club area. *Id*. The Coast Guard broadcasted an emergency broadcast message and sent a rescue boat to Saginaw Bay to search for the distressed boater, but no one was found. *Id*. The Coast Guard also deployed shoreside personnel to search the area—which took about an hour—but found no one in distress; the search was then called off. *Id*. at PageID.4–5.

---

[1] VHF Channel 16 is designated by the Federal Communications Commission (FCC) as the national distress, safety, and calling frequency. ECF No. 1 at PageID.3.

Then, on March 19, 2023, the hoax calls began again. *Id.* at PageID.6. At approximately 12:05 a.m., Detroit Command Center received three radio transmissions on VHF Channel 16, again from an unknown male caller. *Id.* The three consecutive transmissions were received within one minute of each other, with the third transmission calling, "MAYDAY, MAYDAY, MAYDAY." *Id.* The Detroit Command Center officer replied and asked whether the broadcaster needed assistance, but—like the first round of hoax calls—there was no reply. *Id.* The Coast Guard used its Rescue 21 data, which provides lines of bearing for radio transmissions, and determined that the transmissions came from the area around 10th Street in Sebewaing, Michigan. *Id.* Based on the location and familiarity with the previous transmissions, the case was suspended as a probable hoax. *Id.* at PageID.7.

On March 24, 2023, CGIS agents canvassed the area around 10th Street in Sebewaing, Michigan. *Id.* While in the area, a local resident indicated that Defendant was known in the community as an amateur radio operator and had an antenna at his residence on 10th Street. *Id.* Later that afternoon, Defendant consented to meet with CGIS agents at the Sebewaing Marine Harbor. *Id.* The interview between Defendant and the CGIS agents was recorded. *Id.* It was during this interview that Defendant indicated that he *did* hold an amateur FCC license, but he denied making the hoax calls. *Id.* Indeed, Defendant denied having the equipment to even transmit over VHF Channel 16. *Id.* But he later admitted, during the same conversation, that he could monitor and transmit on VHF Channel 16 from his boat.[2] *Id.*

On March 31, 2023, CGIS agents sent the recordings of the hoax calls and their meeting with Defendant to the Language Technology Institute, School of Computer Science, Center for

---

[2] Defendant argues that his boat was in storage and away from his house at the time of the alleged hoax calls. ECF No. 48 at PageID.648.

Voice Intelligence and Security at Carnegie Mellon University (Carnegie Mellon) for analysis. *Id.* Dr. Rita Singh, a speech and voice research professor at Carnegie Mellon, conducted the analysis. *Id.* On June 9, 2023, the Coast Guard received the results of Dr. Singh's analysis, in which she concluded that there was a 98% likelihood of a match between the hoax calls and the sample of Defendant's voice from the conversation he had with CGIS agents. *Id.* at PageID.7 –8.

So on October 19, 2023, the Government filed a Criminal Complaint, charging Defendant with knowingly and willfully communicating a false distress message to the USCG under 14 U.S.C. § 521, and making false statements under 18 U.S.C. § 1001. ECF No. 1. Then, on August 14, 2024, Defendant was indicted by a grand jury on two counts of 14 U.S.C. § 521(c) for communicating a false distress message to the United States Coast Guard. *See* ECF No. 21.

On June 9, 2025, with the understanding that the Government intended to call Dr. Singh to testify at trial, Defendant filed a motion *in limine* to exclude her testimony. *See* ECF No. 33 at PageID.99. This Court subsequently conducted a *Daubert* hearing over the course of three separate dates and several hours. *See* ECF Nos. 44–46.

## B.

Admittedly, Dr. Singh's[3] methodology for determining that Defendant was the hoax caller is technical and complex. Therefore, this Court will do its best to describe Dr. Singh's analysis.

---

[3] Dr. Singh is accomplished in her field. She is a Research Professor at Carnegie Mellon's Language Technologies Institute, a Visiting Research Professor at the University of Pittsburgh, and Director of Carnegie Mellon's Center for Voice Intelligence and Security. ECF No. 40 at PageID.228. Her more than twenty-year career focuses on speech and audio processing and cyber forensics, includes multiple patents, extensive publications and presentations, and hundreds of media citations. *See id.* at PageID.229–55. She also reports routinely assisting United States law enforcement agencies, including the CGIS, Department of Homeland Security. Federal Bureau of Investigation (FBI), and others. *Id.* at PageID.228.

In her report, Dr. Singh identified eight recordings sent to her by CGIS, labeled "us479" through "us486":

 **us479**: Call 1 0432Z 19MAR2023.wav
 **us480**: Call 2 0433Z 19MAR2023.wav
 **us481**: Call 3 0433Z 19MAR2023.wav
 **us482**: obscene reporter 1 14MAR2023.wav
 **us483**: obscene reporter 2 14MAR2023.wav
 **us484**: obscene reporter 3 14MAR2023.wav
 **us485**: obscene distrell call 14MAR2023.wav
 **us486**: Voice Sample - (PI) Bills 24MAR2023.amr[1]

ECF No. 40 at PageID.260.

The recording entitled "us486" is the recording of the conversation that Defendant had with CGIS agents, with his voice isolated and "sectioned out" manually into twelve different sections for analysis:

```
0:20:821 – 0:35:027
0:52:796 – 0:56:003
1:00:460 – 1:01:639
1:03:020 – 1:06:913
1:08:980 – 1:10:036
1:11:871 – 1:12:418
2:14:255 – 2:17:655
2:19:521 – 2:27:293
2:43:925 – 2:47:047
2:59:654 – 3:13:062
3:24:635 – 3:25:414
3:45:881 – 3:50:676
```

*Id.* at PageID.258. These recordings of Defendant's conversation were deemed Section-Set 1. *Id.* Dr. Singh then compared the recordings of the hoax caller, "us479–us485," to each other and concluded that they originated from the same person. *Id.* She identifies this set of recordings,

us479–us485, as Set 2. *Id.* She then set out to determine if Defendant's voice from Section-Set 1 matched the person's voice from Set 2. *Id.*

But then came the problem: how best to compare these two sets of voices? Dr. Singh began her analysis by creating several signal spectrograms of the sets of voices and manually examining those spectrograms[4] to determine which voice features[5] she should analyze to determine if there is match between the voices in Section-Set 1 and Set 2. *See id.* at PageID.261; *see* ECF No. 44 at PageID.358–59. An example of one of Dr. Singh's spectrograms[6] is shown below:

---

[4] The spectrograph has a problematic history in United States courts. "Spectrograms are visual representations of audio – representing time, frequency, and amplitude all on one graph." AUDREY MARTINOVICH, *Understanding Spectrograms*, IZOTOPE, (Nov. 12, 2024), https://www.izotope.com/en/learn/understanding-spectrograms. The spectrograph is a machine that samples energy levels over small frequency ranges and marks them on a sheet of paper. JENNIFER OWEN, *Voice Identification: The Aural/Spectrographic Method*, OWEN FORENSIC SERVICES (Jul. 29, 2018) https://www.owenforensicservices.com/voice-identification-the-aural-spectrographic-method/. The process is repeated for multiple sounds, forming a graph that can be used to compare their frequencies. *Id.* Eventually, this process was computerized to enable greater comparative analysis. *Id.* Notably, courts have been skeptical about the admissibility of spectrographs themselves post- *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993). *See, e.g., United States v. Angleton*, 269 F. Supp. 2d 892, 905 (S.D. Tex. 2003). Indeed, older voice printing technology appears to have fallen out of favor. MICHAEL J. SAKS, ET AL., *Forensic Bitemark Identification: Weak Foundations, Exaggerated Claims*, 3 J. L. & BIOSCIENCES 538, 541 (2016) ("[T]he eulogy for voiceprints was given by the National Academy of Sciences in 1979 following which the FBI ceased offering such experts"). But since Dr. Singh merely uses spectrographs to decide which features she should further test, rather than including the spectrograph as an independent variable within her analysis itself, the Court need not delve further into the admissibility of spectrographs.

[5] Dr. Singh notes that there are at least 44 independent measurements she could have taken of the voice sets, but she chose a much lower amount. ECF No. 44 at PageID.351.

[6] Dr. Singh testified that the vertical dimension of the graph represents the frequency at which the person spoke. ECF No. 44 at PageID.352–53. Lighter colored areas indicate higher energy levels. ECF No. 40 at PageID.261. This particular spectrograph is of us479 with a small section, highlighted on the graph, of us482 spliced into the center. ECF No. 40 at pageID.261. From here, Dr. Singh would conduct a "manual expert analysis" of the spectrograph and several others to identify which features needed to be tested to determine whether there is a match between Section-Set 1 and Set 2. *See id.*



ECF No. 40 at PageID.261.

From here, Dr. Singh identified ten total features, eight of which were semi-automated[7] and two were completely automated. The features are listed as follows:

Semi-automated:
1. Spectral tilt of phonated sounds
2. Hammarberg Index
3. Relative distribution of energy in the harmonics of phonated sounds
4. Fundamental frequency values (average 101.5 Hz in both cases), and variations between voiced sounds
5. Modulation characteristics (3)
6. Voicing onset times between stop-consonant/vowel pairs
7. Spectral peaks across the same phonemes; formant positions and bandwidths
8. Slope of the second formant

Automated:
9. d-vector based speaker-ID algorithm with support vector machine
10. d-vector based speaker-ID algorithm with neural network (AI)

*Id.* at PageID.258. Because of the complexity of the science behind each feature, this Court will provide a brief overview of how each feature is determined.

### 1. Semi-Automated Features

---

[7] By semi-automated, Dr. Singh means that "final conclusions . . . by manual inspection of evidence from an automated analysis." ECF No. 40 at PageID.257.

***Spectral tilt.*** According to Dr. Singh, "[s]pectral tilt captures how quickly high-frequency energy decays relative to low-frequency energy in voiced speech." ECF No. 40 at PageID.262. At the hearing, Dr. Singh further elaborated on what spectral tilt measures:

> When we produce sound, we are able to put in more energy in the lower frequencies and relatively less energy in the higher frequencies because it takes us a lot of effort to put energy in the higher frequencies. So if you look at the energy histogram of frequencies, it has a tilt. It is higher. Its bends are higher in the lower frequency ranges, and as you go towards the higher frequencies, there is a downward tilt to the energy.

ECF No. 41 at PageID.326–27.

The spectral tilt is calculated using a complicated formula, *see* ECF No. 40 at PageID.262, but what that formula measures is the "general slope or trend of the spectral energy distribution across frequencies . . . [providing] insight into the balance between low and high frequencies in a voice signal." *Id.* at PageID.266. She then determines if the spectral tilt matches across phonemes.[8] The following figure presents a whisker plot illustrating phoneme matches; the blue and red boxes correspond to the Defendant's speech in the CGIS interview and the hoax call, respectively, while the orange and yellow boxes depict random speakers:

---

[8] Phonemes are the smallest units of sound that make up a whole word. LAURA WALKER, *What Are Phonemes and Graphemes?*, SOUNDS-WRITE, (Feb. 25, 2023), https://sounds-write.co.uk/what-are-phonemes-and-graphemes/.



*Id.*

**Hammarberg Index.** The second feature that Dr. Singh analyzed is the Hammarberg Index. "The Hammarberg Index contrasts the strongest harmonic below 2 kHz with the strongest above 2 kHz."[9]  *Id.* at pageID.263. Explained another way, the Hammarberg Index "is looking at the difference in the peak energy in the harmonics, in the 0 to 2000 hertz range and the 2000 to 5000 hertz range." ECF No. 44 at PageID.375–76. From there, one selects the highest-energy harmonic in the 2000 to 5000 hertz range and compares it with the energy in the 0 to 2000 hertz range. *Id.*

**Distribution of the energy of the harmonics of phonated sounds.** For the third feature, Dr. Singh determined how energy was distributed among the harmonics in phonated sounds—sounds

---

[9] In physics, a harmonic is a wave that vibrates at a whole-number multiple of a basic vibration—the fundamental frequency. *See Fundamental Frequency and Harmonics*, PHYSICSCLASSROOM, (last visited Jan. 6, 2025), https://tinyurl.com/mr4azf9k. The fundamental frequency is the lowest vibration, and subsequently, is called the first harmonic. *See id.* As an example, consider a tuning fork: when it vibrates, it makes one main sound (the fundamental), but there are also tiny "echoes" of that vibration at twice, three times, and four times the speed—those are harmonics.

created when the vocal folds vibrate. *Chapter 3: Anatomy and Physiology of the Speech Mechanism*, Bradley University Library, (last visited Jan. 6, 2025) https://tinyurl.com/26fu5fum. To estimate this distribution, Dr. Singh used the Harmonic Richness Factor (HRF). ECF No. 40 at PageID.270. "HRF quantifies the contribution of higher harmonics relative to the fundamental harmonic in audio signals." *Id.* Dr. Singh gave a more complete explanation during the hearing:

> The harmonic richness factor is a proxy. It's a measurement for the energy in the harmonics. It's a ratio of the energy in the higher harmonics with--compared to the first--energy in the first harmonic. It can be measured in a few different ways, but it actually is a way measuring the energy distribution across harmonics, which is very individual to the speakers . . . .

ECF No. 44 at PageID.390.

***Fundamental frequency values and variations between voiced sounds.*** For the fourth feature, Dr. Singh measured the variations in fundamental frequencies across select sounds. As noted, fundamental frequencies are the lowest frequency of a periodic wave. *See supra*, n.9; *see also* ECF No. 40 at PageID.273. The fundamental frequency is the actual rate at which one's glottis[10] is opening and closing, or in other words, vibrating, per second. ECF No. 44 at PageID.391. So the fundamental frequency is like a baseline pitch of one's voice. *Id.* at PageID.392.

Dr. Singh also described what she was seeking in this feature when determining if two speakers were the same:

---

[10] The glottis is the middle region inside the larynx (voice box) that's made up of the vocal folds (vocal cords), the space between them, and the cartilages that move them. *Glottis*, ClevelandClinic.org, (last visited Jan. 6, 2026), https://my.clevelandclinic.org/health/body/glottis.

I'm looking at the length of the vocal folds. When the length of the vocal fold changes, the pitch changes. And so the—the vocal folds of men are longer than the vocal folds of women, for example, and the vocal folds of women and children are comparable.

Longer vocal folds result in lower fundamental frequencies.

*Id.* at PageID.403–04.

*Modulation characteristics.* For the fifth feature, Dr. Singh analyzed the "modulation characteristics," which she described as follows:

So as we speak, our respiration has a lot to -- has a big role to play in the speech that we produce.  So the modulation measures are measuring aspects of a person's respiratory dynamics and the way it reflects in spectral measures is that you don't -- when I say that you're producing thousands of frequencies and they change over time, they're not really -- when you look at them at a fine level, not really steady. They wobble a little, and they wobble in frequency and amplitude.

What we are looking at is the modulation -- that wobble is referred to as modulation. I'm looking at the wobble over time in the amplitudes of each of the frequencies that is produced by this person.  Those measures are measuring those values.  There are three measures, one is a centroid, one is a power ratio and another one is an amplitude modulation straight up.

ECF No. 44 at PageID.410–11.

Dr. Singh analyzed three modulations. The first modulation is called "amplitude modulation depth," which is as simple as comparing the ups and downs in energy in a given frequency; so, in other words, comparing the top of the modulation to the bottom. *Id.*  The second modulation is the "modulation spectrum centroid," which is done by calculating the spectrum of one's speech as the frequency content of that speech and looking at the central part of that spectrum, or, in other words, finding the average. *Id.* at pageID.412. Lastly, the third modulation is the "modulation-power ratio." ECF No. 40 at PageID.276. Admittedly, this modulation appears to be more technical. It's best described as a ratio composed of aggregations of frequencies within specified hertz ranges. ECF No. 44 at PageId.413.

Dr. Singh demonstrated what she looks for when analyzing these three modulations through three separate figures:



ECF No. 40 at PageID.276. This first figure analyzes the amplitude modulation depth. At the outset, Dr. Singh examines a person's speech and breaks it up into different sounds, and then categorizes those sounds. ECF No. 44 at PageID.414. For instance, one category is vowels, and another category is "fricatives"—sounds produced due to friction. *Id.* And, like the last whisker plot, the blue speech measures Defendant's interview recording, red bars represent the hoax calls, and the green and yellow bars are from random speakers. *Id.* at PageID.415. From there, Dr. Singh compares the whisker boxes across the clusters of recordings. *Id.*

The next two figures follow the same color-coding scheme and sound breakdown, but for the modulation spectrum centroid and the modulation-power ratio, respectively:



Figure 9: A comparative analysis of the second Mel-frequency cepstral coefficient (MFCC2) across all audio files.



Figure 10: A comparative analysis of the third Mel-frequency cepstral coefficient (MFCC3) across all audio files.

ECF No. 40 at PageID.277.

*Voice onset times (VOT) between stop-consonant/vowel pairs.* While one could spend a great deal of time describing this feature, this Court will not. That's because, while Dr. Singh did explain that this measurement was "found to lie within a range consistent for the same speaker,"

she did not factor this feature in her analysis because "these readings were too few due to the tedious nature of the work" and were "not considered in making the final decision about a possible match." ECF No. 40 at PageID.279.

***Spectral peaks across the same phonemes; formant positions and bandwidths.*** Next, Dr. Singh analyzed the formant[11] positions and bandwidths[12] across all phoneme groups for the different audio files. *Id.* Dr. Singh acknowledged that only three formants could be reliably measured from the recordings. ECF No. 44 at PageID.421. She then examined the positions and bandwidths of those formants and, using a formula, determined whether the speakers were the same. *Id.* at PageID.421–22. She demonstrated her analysis across three separate whisker plots, which compared the formant position and bandwidths between speakers—in the same color-coded fashion as the previous whisker plots—for each of the three formants that she could reliably measure:

---

[11] Formants are the loudest group of harmonics and help distinguish vowels from one another. *Formant*, VAIA, (last visited Jan. 6, 2026), https://tinyurl.com/5yc99236. Formant frequencies are the natural resonances of the vocal tract shaped by several facial and throat structures, including the tongue, jaw, lips, etc. ECF No. 40 at PageID.264.

[12] A "bandwidth" is the spread of energy around a peak frequency that gets amplified in the vocal tract. ECF No. 44 at PageID.421.



Figure 11: A comparative analysis of the frequencies/positions (left) and bandwidths (right) of the first formant across all files. Color coding is as in the prior charts in this document.



Figure 12: A comparative analysis of the frequencies/positions (left) and bandwidths (right) of the second formant across all files. Color coding is as in the prior charts in this document.



Figure 13: A comparative analysis of the frequencies/positions (left) and bandwidths (right) of the third formant across all files. Color coding is as in the prior charts in this document.

ECF No. 40 at PageID.279–80.

***Slope of the second formant.*** The last of the semi-automated features is the slope of the second formant. As Dr. Singh explained, "the second formant calculates your speaking style, the way you articulate your vowels, consonants, fricatives, and various other groups of sounds that your vocal tract is able to produce when you speak." ECF No. 45 at PageID.443. The slope of the second formant specifically captures the way one's "articulators[13]" move when one goes from one sound to the next. *Id.* So the *way* you speak is what is tracked by the slope of the second formant. *See id.*

The slopes of the second formant were calculated using a formula. *See* ECF No. 40 at PageID.265. She measured these slopes across phoneme groups to determine if they matched across speakers. *See id.* at PageID.282. She exemplified a comparison of one such calculation using a spectrogram:



Figure 14: A section of obscene reporter 3 14MAR2023.wav spiced into voicesample-3.24.635-3.25.414.wav The formants are visible as the high-energy more intense bands. White lines have been drawn flanking the formants to be noted in this example.

---

[13] "Articulators in the field of speech and language pathology refer to the physical structures used to produce speech sounds," including the lips, teeth, uvula, tongue, etc. Oseh Mathias, *Articulators*, SPEECHFIT, (Jul. 21, 2023), https://speechfit.io/glossary/a/articulators.

*Id.* at PageID.282. In this spectrogram, there is a smaller section from one of the hoax calls spliced (labeled "inserted splice") into the speech from Defendant's interview with the CGIS agents. *Id.* The white lines represent the consistency of the slope of the second formant across both the interview speech and the hoax call. *Id.*

### 2. Automated Analysis

Next, Dr. Singh ran an automated analysis, meaning a machine performed it. Notably, while Dr. Singh appears to have analyzed two separate features—(1) a d-vector-based speaker-ID algorithm with a support vector machine and (2) a d-vector-based speaker-ID algorithm with a neural network (AI)—she addressed this analysis in her report under one section heading: "Automated Analysis." ECF No. 40 at PageID.283. So the Court will similarly group the features under the category of "automated analysis."

For the automated analysis, Dr. Singh used, in her words, "the best available automated speaker identification system there is to date": Reshape Dimensions Network or ReDimNet. ReDimNet is a neural network that takes a recording as a "signal in time" or as an image, such as the spectrogram. ECF No. 45 at PageID.450–51. A signal in time is a series of numbers in time that represent sound. *Id.* Dr. Singh calls this a one-dimensional representation. *Id.* When this time-domain signal is converted to a spectrogram, it becomes a two-dimensional representation. *Id.*

So, ReDimNet uses its neural network to take one- and two-dimensional representations and alternates between concentrating information in the one- and two-dimensional representations. *Id.* Through this process, ReDimNet captures as much relevant information about the speaker as possible within a mathematical space called the "embedding space." *Id.* And, within the embedding space, the information "is represented in a way that similar speakers are very close together and dissimilar speakers are as far apart as possible." *Id.* The system uses an artificial

intelligence (AI) system to complete this task. *Id.* The added bonus of this system is that, because speakers that are the same will appear similar, inputting random speakers, as Dr. Singh did, would naturally show a sharp contrast. *See id.* at PageID.453. Dr. Singh demonstrated how the ReDimNet worked using a graph:



Figure 15: Cosine similarity matrix comparing audio files processed by the ReDimNet system, with values indicating speaker embedding similarity. Colors closer to dark red indicate a match, closer to dark blue indicate mismatch. All files are matched against all files in this matrix. A file containing only random noise, and one containing a random speaker from a large database of speech are also included in the analysis.

ECF No. 40 at PageID.283.

On both axes are labels for the hoax calls, Defendant's voice from the interview with the CGIS, random noise, and a random speaker. *Id.* Dr. Singh explained that the idea behind this automated model is to compare every recording with every other recording. ECF No. 45 at PageID.454. So, for example, the red diagonal in the middle, in which each box is "1," represents when a recording is being compared to itself—a perfect match. *Id.* at PageID.455. Therefore, the

closer a number is to "1," the more closely the recordings match. Dr. Singh stated that she believed the numbers to be within an acceptable range for a speaker match. *Id.* at PageID.459.

At bottom, Dr. Singh's expert analysis consisted of eight total features, including (1) spectral tilt, (2) the Hammarberg Index, (3) distribution of the energy of the harmonics of phonated sounds, (4) fundamental frequency values and variations between voiced sounds, (5) the three modulation characteristics. (6) spectral peaks across the same phonemes; formant positions and bandwidths, (7) slope of the second formant, and (8) an automated analysis using ReDimNet.

### 3. Conclusions

From the eight features mentioned above, Dr. Singh concluded that Defendant was the speaker who made the hoax calls. ECF No. 40 at PageID.284. In coming to this conclusion, Dr. Singh noted that "[s]cientific literature deems these features to be *independent* (not derivable from each other) and therefore probabilities based on them *aggregate* as products of individual probabilities." *Id.* (emphasis added). So, Dr. Singh estimated a false match rate,[14] or "FMR," for each of the different factors from "forensic voice corpora and peer-reviewed studies." *Id.* at PageID.285. The chart below illustrates the FMR's for each feature:

---

[14] The false match rate is the probability that a random, unrelated speaker would match an individual feature. ECF No. 40 at PageID.285.

| Feature | FMR | Notes / Source Type |
|---|---|---|
| Spectral Tilt | 1 in 10 | Broad distribution, modest discrimination (no standalone EER; based on forensic voice corpora patterns). |
| Hammarberg Index | 1 in 15 | Stable within a speaker; moderate between-speaker overlap (no standalone EER). |
| Harmonic Richness Factor (HRF) | 1 in 15 | Moderately speaker-specific harmonic profile (no standalone EER). |
| Fundamental Frequency patterns | 1 in 10 | From long-term F0 studies; overlaps between speakers in population. |
| MFCC (1–3) | 1 in 20 | Strong discrimination in ASR/FVC literature. |
| Formant positions/bandwidths | 1 in 20 | When aligned over multiple vowels; strong indicator. |
| Second Formant Slope | 1 in 10 | Moderate discrimination alone. |
| Automated model (ReDimNet) | 1 in 100 | From published EER ≈1% on VoxCeleb1-H. |

Table 11: Assigned conservative FMRs for all features with consistent matches in this case.

*Id.* And, treating each of the eight figures as independent, Dr. Singh calculated the probability of a random match as 1 in 9 billion:

$$P_{\text{random match}} = \frac{1}{10} \times \frac{1}{15} \times \frac{1}{15} \times \frac{1}{10} \times \frac{1}{20} \times \frac{1}{20} \times \frac{1}{10} \times \frac{1}{100} \approx \frac{1}{9 \times 10^9} \quad \text{(Chance: 1 in 9 billion)}. \tag{7}$$

*Id.* at PageID.286.

But there is another problem. Not all these FMRs have been fully vetted and submitted to a complete peer-review process at this time regarding speaker identification. ECF No. 45 at PageID.464–65. Indeed, as Dr. Singh testified, "these [error rates] are well known but they're not as such reported in speaker identification cases." *Id.*

So Dr. Singh ran another calculation, but only with the features that had error rates specifically noted in the scientific literature on speaker identification. *Id.* And in her report, Dr. Singh not only notes the error rates but also identifies the studies that included them:

| Feature / System | Reported EER | Corpus / Condition (source) | Chance $\approx$ 1 in X |
|---|---|---|---|
| Long-term F0 distribution (LTF0) | 10.7% | Odyssey 2008; 201 male JP speakers; six LTF0 params; LR discrimination (201 target / 80,400 non-target trials) [30, 31] | ~ 9 |
| Long-term voice-quality acoustics (incl. spectral tilt/HNR) | Mean 9.6% (HQ), best 5.8% | ICPhS 2019; VQ system across HQ/TEL/Mobile; CPP/tilt subsets; EER and $C_{llr}$ reported [32, 33] | ~ 10 (HQ mean) |
| Long-term formants & bandwidths (LTFDs) | 10.33% (studio); higher on tel. conditions | Interspeech 2018; calibrated GMM-UBM LRs with F1–F3(–F4) [34] | ~ 10(studio) |
| MFCC system (forensic FVC setting) | 3.23% | Interspeech 2017 (DyViS); MFCCs+$\Delta$+$\Delta\Delta$ system validity [35] | ~ 31 |
| Deep embedding (ReDimNet) | 1.00% (VoxCeleb1-H, cleaned); 0.77% (SITW core-core) | Interspeech 2024 / arXiv; cleaned VoxCeleb1 protocols and out-of-domain SITW [27] | 100 (Vox1-H); 130 (SITW) |

Table 12: Published error rates (EER) for some features. Where peer-reviewed sources report an *equal error rate* (EER), we quote that value and its reciprocal as the approximate random-match chance at the EER operating point for that system alone.

ECF No. 40 at PageID.286.

Notably, the chart reports "EER," or equal error rate, for the features present in the scientific literature. The equal error rate is the point at which the FMR equals the false acceptance rate (FAR).[15] ECF No. 45 at PageID.466. The EER is a standard reporting metric across the scientific literature. *Id.*

From, what she could find in the scientific literature, Dr. Singh was only able to locate error rates for five features: (1) spectral tilt, (2) the three modulation characteristics, (3) fundamental frequency values and variations between voiced sounds, (4) spectral peaks across the same phonemes; formant positions and bandwidths, and (5) the automated model: hereinafter the "Five

---

[15] The false acceptance rate is the rate at which two speakers are different, and the researcher falsely accepts them to be the same. ECF No. 45 at PageID.466.

Scientific Literature Features." ECF No. 40 at PageID.286–87. The chance of a random match for this group of features alone was 1 in 2.9 million:

Chance of random match:

$$P_{\text{random match}} = 0.01 \times 0.107 \times 0.1033 \times 0.0323 \times 0.096$$

$$\approx 3.43 \times 10^{-7} \approx \frac{1}{2.92 \times 10^{6}} \quad \text{(about 1 in 2.9 million).} \tag{9}$$

*Id.* at PageID.287.

By contrast, call the other three features—(1) the Hammarberg Index, (2) distribution of the energy of the harmonics of phonated sounds, and (3) slope of the second formant—will hereinafter be referred to as the "Three Non-Scientific Literature Features."

## II.

Federal Rule of Evidence 702 allows certain witnesses with specialized knowledge to provide opinion testimony at trial. FED. R. EVID. 702. But admitting specialized opinion testimony is not a decision a court should undertake lightly, as juries tend to place extra weight on expert opinions. *See Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 589 (1993). Accordingly, courts serve an important gatekeeping role when assessing proffered expert testimony, striving to admit qualified, reliable, and relevant opinions but exclude unreliable and misleading "junk science." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). "This gatekeeper role involves three basic inquiries." *Navarro v. Procter & Gamble Co.*, No. 1:17-CV-406, 2021 WL 868586, at *2 (S.D. Ohio Mar. 8, 2021).

First, a court must determine whether a proposed witness is qualified as an expert according to his or her "knowledge, experience, training, or education." FED. R. EVID. 702. Whatever the form, "[a]n expert's qualifications must provide a foundation for an expert to answer the specific

questions in the expert report." *Thomas v. Lambert*, 606 F. Supp. 3d 592, 599 (E.D. Mich. 2022) (internal quotations and citations omitted). If satisfied that the proffered expert is sufficiently qualified, the court then turns to the expert's proffered testimony, asking whether such testimony is relevant and would assist the jury in understanding the evidence at trial or determining a genuine factual issue. FED. R. EVID. 702(a); *Daubert*, 509 U.S. at 587–89. Finally, a reviewing court considers whether the proffered expert testimony is reliable, by analyzing a non-exclusive list of factors including (1) whether the expert's theory or technique can or has been tested; (2) whether the expert's theory or technique has been subjected to peer review or publication; (3) the known or potential rate of error; and (4) whether the expert's theory or technique has been generally accepted within the relevant field or industry. *First Tennessee Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 334 (6th Cir. 2001) (citing *Daubert v. Merrell Dow Pharm.,* 509 U.S. 579, 593–94 (1993)).

The party offering the expert has the burden of proving admissibility of the expert's opinion by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n.10. "[R]ejection of expert testimony is the exception, rather than the rule." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008) (internal quotation marks omitted) (quoting Fed. R. Evid. 702 Advisory Committee's Note, 2000 Amend.). And the trial court's gatekeeping role does not permit it to reject admissible expert testimony with a reasonable factual basis, but it does permit exclusion when an expert's testimony amounts to "mere guess or speculation." *Id.* (citing *U.S. v. L.E. Cooke Co., Inc.*, 991 F.2d 336, 342 (6th Cir. 1993)). In general, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted).

## III.

### A.

As a threshold matter, Defendant asserts that Dr. Singh's testimony is inadmissible under Federal Rule of Evidence 901, which governs the authentication and identification of evidence. ECF No. 33 at PageID.99. Defendant points to an advisory note in Rule 901 which reads in part:

> *Since aural voice identification is not a subject of expert testimony*, the requisite familiarity may be acquired either before or after the particular speaking which is the subject of the identification . . . .

FED R. EVID. 901, Advisory Committee Note Ex. 5 (1975). But, as courts within the Sixth Circuit have noted, this advisory note dates to the 1970s, before the *Daubert* standard was established, and is supported by citation to cases published between 1935 and 1952. *United States v. Felix*, No. 1:17-CR-009, 2019 WL 2744621, at \*4 (S.D. Ohio July 1, 2019). This advisory note appears to be outdated, as evidenced by courts' recent application of the Daubert standard to voice identification. *See, e.g, United States v. Angleton*, 269 F. Supp. 2d 892 (S.D. Tex. 2003); *United States v. Mills*, 858 F. App'x 463 (3d Cir. 2021); *Felix*, No. 1:17-CR-009, 2019 WL 2744621.

And advisory committee notes are not binding on federal courts. *See Tome v. United States*, 513 U.S. 150, 167 (1995) (Scalia, A. concurring) ("Having been prepared by a body of experts, the Notes are assuredly persuasive scholarly commentaries—ordinarily *the* most persuasive—concerning the meaning of the Rules. But they bear no special authoritativeness as the work of the draftsmen . . . ") (emphasis in original). So this Court will no longer dwell on this question and move to the *Daubert* analysis.

**B.**

While Federal Rule of Evidence 702 generally requires a court to inquire about both the qualifications of the expert, *see Lambert*, 606 F. Supp. 3d at 599, and the relevancy of their testimony, *see Daubert*, 509 U.S. at 587–89, Defendant challenges neither. *See generally* ECF No. 33.

Instead, Defendant only challenges the reliability of Dr. Singh's testimony. *Id.* at PageID.99. So, the Court will focus its attention there. And the weight of the *Daubert* factors supports admissibility of Dr. Singh's testimony insofar as it applies to the Five Scientific Literature Features, which have clear evidence in the scientific literature concerning their relevance in the field of speaker identification, but not as to the Three Non-Scientific Literature Features, which have not been peer reviewed in the field of speaker identification.

**1. Testability**

The first of the Daubert factors requires that a scientific theory "can be (and has been) tested." *Daubert*, 509 U.S. at 593. In the absence of proof that a technology can be tested, there is no way to demonstrate whether it does what it is supposed to do. *United States v. Gissantaner*, 990 F.3d 457, 463–64 (6th Cir. 2021). And the question of testability concerns whether the method can be "assessed for reliability," not whether it always yields the correct answer. *Id.* at 65. "Disputes about the 'adequacy of the [theory's] testing' or about the 'accuracy of [a theory's] results,' generally speaking, provide grist for adversarial examination, not grounds for exclusion." *Id.* (citing *United States v. Bonds*, 12 F.3d 540, 558–59 (6th Cir. 1993)).

Defendant does not argue that the features Dr. Singh analyzes are untestable. Indeed, he agrees that "these measurements may [be] reviewable." ECF No. 48 at PageID.648. Instead, Defendant "challenges whether this handful of measurements can be used to identify a unique

speaker." *Id.* But the testability factor under *Daubert* does not challenge the accuracy of a theory, but rather whether that theory itself is testable. *See Gissantaner*, 990 F.3d at 464. Dr Singh notes in her report that the Five Scientific Literature Features have all been tested for their ability to identify speakers. ECF No. 40 at PageID.286–87.

And the Three Non-Scientific Literature Factors that Dr. Singh included in her analysis all use well-established formulas. *See* ECF No. 40 at PageID.263, 265. And Dr. Sing testified that these formulas are all peer-reviewed, have false-positive rates, and allow other practitioners to repeat the same examination and test the reliability of her results. *See* ECF No. 44 at PageID.377 (noting that the Hammarberg Index formula is documented in the scientific literature and generally accepted); *id.* at PageID.393 (noting that the "Fourier transform" —the formula used to calculate the HRF—is well-known in the scientific literature); *id.* at PageID.448 (noting that the formula for identifying the slope of the second formant is generally accepted in the scientific community). Clearly, because the formulae for these three features are known in the scientific community, they can be used to test Dr. Singh's theories. As the Sixth Circuit explained in *Gissantaner*, the question is whether a method can be assessed for reliability. *Gissantaner*, 990 F.3d at 464. Dr. Singh's theories can be assessed for their reliability.[16] This factor conclusively weighs in favor of the admissibility of her testimony.

---

[16] Courts within the Sixth Circuit have stated that an expert need not *even* test their *own* theories to satisfy a *Daubert* inquiry. *See Anderson v. Ridge Tool Co.*, No. CIV.A. 06-116-HRW, 2008 WL 3849923, at *5 (E.D. Ky. Aug. 14, 2008) ("There is no requirement that an expert's theories must actually be tested in order to satisfy the Daubert inquiry."); *Benton v. Ford Motor Co.*, 492 F.Supp.2d 874 (S.D.Ohio, 2007) ("Defendant criticizes [the expert] for not having done any testing in this case. This misunderstands, however, *Daubert's* preference for testing in the first factor."); *see also Clay v. Ford Motor Co.*, 215 F.3d 663, 668 (6th Cir. 2000) (stating that an expert's failure to test their theory goes to the weight of the testimony, not admissibility). Dr. Singh has gone a step further and tested her own theories by running calculations for each of the eight features in her analysis. Thus, the testability factor easily weighs in favor of admission.

## 2. Peer Review and Publication

The second *Daubert* factor, peer review and publication, is a measure of reliability because it indicates that a method has been "submitted to the scrutiny of the scientific community." *Gissantaner*, 990 F.3d 457 at 464 (quoting *Bonds*, 12 F.3d at 559). Publication in a peer-reviewed journal satisfies this requirement. *Id.* (citing *Daubert*, 509 U.S. at 594).

Here is where things become complex. As noted previously, only the Five Scientific Literature Features have been tested for their ability to identify speakers in peer-reviewed journals. *See supra*, III.B.1.; *see also* ECF No. 40 at PageID.286.

And at the hearing, Dr. Singh acknowledged that the Three Non-Scientific Literature Features have not been tested in the field of speaker identification. *See* ECF No. 45 at PageID.463–65. As the Sixth Circuit in *Gissantaner* noted, "[w]hen scientific research is accepted for publication by a reputable journal following the 'usual rigors of peer review,' that represents 'a significant indication that it is taken seriously by other scientists, i.e., that it meets at least the minimal criteria of good science.'" *Gissantaner*, 990 F.3d at 465 (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995)). Without publication in a peer-reviewed journal, it is impossible to determine if the three Non-Scientific Literary Features have been tested and subjected to the rigorous analysis of the relevant scientific community. The Government notes that Dr. Singh has an article currently under peer review that analyzes the likelihood that someone's voice can be identified across the forty-four unique dimensions Dr. Singh alluded to in her testimony. ECF No. 47 at PageID.608. But while the Court takes note that Dr. Singh's article may be selected for publication after clearing peer review, it has not done so yet.

The Government also asserts that the Organization of Scientific Area Committees'[17] ("OSAC") guidelines indicate Dr. Singh's methods are currently accepted in the field. *Id.* While this may be indicative that Dr. Singh's theories have received general acceptance within the speaker identification scientific community, it does *not* indicate that these theories have been subjected to the "usual rigors of peer review."

At bottom, this factor weighs in favor of the admissibility of the Five Scientific Literature Factors, but not the Three Non-Scientific Literature Factors.

### 3. Error Rate

The third *Daubert* factor considers a method's error rate. "This consideration looks to the error rate of the technology and to whether the scientific community has established standards that forensic scientists can use to mitigate the risk of error." *Gissantaner*, 990 F.3d at 465 (citing *Daubert*, 509 U.S. at 594). The Sixth Circuit has said that it "is not a good idea—not the 'product of reliable principles and methods' under Rule 702—if [a method] has a high error rate, if it has trouble 'avoid[ing]' 'false positives,' and if there are no standards or guidelines to avoid or lessen these risks." *Id.* (quoting *Bonds*, 12 F.3d at 559).

In her expert report, Dr. Singh noted that "[s]cientific literature deems these features to be *independent* (not derivable from each other) and therefore probabilities based on them *aggregate* as products of individual probabilities." ECF No. 40 at PageID.284 (emphasis added). So Dr. Singh

---

[17] OSAC is a research council established in 2014 in collaboration with the National Institute of Standards and Technology and the DOJ, and is geared towards "strengthening the [United States'] use of forensic science by facilitating the development of technically sound standards." *About Us*, NIST.Gov, (last visited Jan. 7, 2026), https://www.nist.gov/adlp/spo/organization-scientific-area-committees-forensic-science/about-us.

multiplied the error rates—which, as explained before, she calls false match rates, or "FMR"—to obtain an overall error rate. *Id.*

Dr. Singh's expert report and testimony identify two distinct error rates. The first error rate combines the FMR's of all eight features she identified. ECF No. 40 at PageID.284; *see also supra* at II.B.3. Here, the total FMR was calculated to be 1 in 2.9 billion. *See id.* But there is a catch. This error rate also includes the FMRs of the Three Non-Scientific Literature Features. Dr. Singh admitted in her testimony that those features do not have FMRs supported in the scientific literature regarding how frequently they incorrectly identify a speaker. ECF No. 45 at PageID.464. Instead, Dr. Singh extrapolated those FMRs for the Three Non-Scientific Literature Features from other scientific fields and applied them to the field of speaker identification. *Id.* at PageID.464–65.

Perhaps foreseeing the Court's reticence about these methods, Dr. Singh provided a separate error rate consisting of the Equal Error Rates ("EER")—which, as explained before, is a standard reporting metric across the scientific literature; is where FMR equals the false acceptance rate (FAR)—of the Five Scientific Literature Features, which all have EERs explicitly identified in peer reviewed studies. ECF No. 40 at PageID.286. From these EERs, Dr. Singh determined an error rate of 1 in 2.9 million. *Id.* at PageID.287.

Dr. Singh did not identify any methods she could have taken to limit the risk of error, and because all her features are generated, in part, by a formula, *see id.* at PageID.262–65—the Court is hesitant to believe that there would be any method by which Dr. Singh could limit the rate of error. But given the error rates in the aggregate, the probability that she is wrong in her conclusions is very low.

Still, the Court takes notice of the fact that the Three Non-Scientific Literature Features do not presently have error rates published in peer-reviewed journals relevant to the field of speaker identification. Therefore, this factor weighs against admissibility for those three features but does weigh in favor of admissibility for the Five Scientific Literature Features.

### 4. General Acceptance in the Scientific Community

The last *Daubert* factor is whether there is general acceptance in the scientific community. *Daubert*, 509 U.S. at 594. Importantly, the "question for debate is 'general acceptance,' not uniform acceptance within the community." *Gissantaner*, 990 F.3d at 466 (citing *Daubert*, 509 U.S. at 594). What matters is whether the relevant scientific community accepts the methods. *Id.* "[T]he long-tested cauldron of cross-examination, not exclusion, is the place to go for accuracy." *Id.*

Dr. Singh testified that the formulae she uses for each of her features are well-known and well-accepted within the scientific literature. ECF No. 44 at PageID.348. The Government correctly points out that there was no evidence to contradict her testimony. ECF No. 47 at PageID.613. But the question is not whether the formulae supporting the features have received general acceptance—clearly, they have—but rather whether the features that Dr. Singh has analyzed have been accepted in the field of speaker identification. The Court finds that these features have been accepted in the speaker identification community.

As noted before, OSAC, or the Organization of Scientific Area Committees, is a federal standards-setting body for forensic science, housed within the National Institute of Standards and Technology (NIST). *About Us*, NIST.Gov, (last visited Jan. 7, 2026), https://www.nist.gov/adlp/spo/organization-scientific-area-committees-forensic-science/about-us. It is partnered with the DOJ. *Id.* In 2024, the Speaker Recognition Subcommittee of OSAC

compiled a proposed set of standards for forensic speaker recognition. ECF No. 47 at PageID.623.

Notably, it is unclear whether this proposed set of standards was ever accepted or is still going

through review. Still, the Court finds that, being one of the preeminent committees for forensic

speaker identification, if the proposed OSAC guidelines support Dr. Singh's methods, then there

is at least general acceptance within the speaker identification community. And the proposed

guidelines do support Dr. Singh's methods.

First, the guidelines state that Acoustic Phonetic Analysis ("AcPa") is one method that may

be used for speaker analysis. ECF No. 47 at PageID.632. The guidelines provide that "AcPa is the

method by which 'the expert analyzes and quantifies physical parameters of the speech signal

using computer software…this is labor intensive, involving a high degree of human input and

judgment." *Id.* (quoting Erica Gold & John P. French, *International Practices in Forensic Speaker

Comparisons*, 18 INT'L J. SPEECH, LANGUAGE AND L., 293, 293–307 (2011)). The guidelines state

that AcPa analysis focuses on "speaker characteristics that have an anatomical motivation,"

including fundamental frequency, formants, and related features. *See* ECF No. 47 at PageID.632–

33. These are the types of features that Dr. Singh used in her semi-automated analysis.

And the guidelines also describe the proper way to conduct an automated analysis, or

Automatic Speaker Recognition ("ASR"). *Id.* at PageID.635. This method requires the use of

specialized software, such as the ReDimNet software that Dr. Singh used in her automated

analysis, to produce "a score that is evaluated from the perspective of the same-speaker origin as

well as the different-speaker origin." *Id.* The guidelines further explain that:

> A typical ASR process involves the extraction of features from a speech sample and
> the use of these features to create a representation of the speaker's voice. Speaker
> representation from different samples are then compared to produce a comparison
> score.

*Id.*

Seemingly, this is what Dr. Singh did with the ReDimNet model. *See* ECF No. 45 at PageID.450 –60.

Defendant counters that the OSAC guidelines mention that 60% of practitioners use a blended method of speaker identification. ECF No. 48 at PageID.652; ECF No. 47 at PageID.641. But the standard for general acceptance under Daubert is not that a method be the only one; rather, it is that the methodology is generally accepted within the scientific community. *See Gissantaner*, 990 F.3d at 466.

Therefore, because both the semi-automated and automated features that Dr. Singh analyzed for her report have received general acceptance within the speaker identification community, this factor weighs in favor of admitting both the Three Non-Scientific Features and the Five Scientific Literature Features.

### 5. Balancing of Factors

Notably, Daubert is not an all-or-nothing test; so, "a District Court can independently consider whether each 'particular scientific [or technical] methodology is reliable.'" *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 189 (3d Cir. 2012) (quoting *Elcock v. Kmart Corp.*, 233 F.3d 734, 745 (3d Cir.2000) (discretely analyzing an expert's various opinions under the lens of Daubert). And a District Court may balance the *Daubert* factors to determine whether testimony may be admitted. *See Kumho Tire*, 526 U.S. at 152 ("[A] trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."); *United States v. Reynolds*, 86 F.4th 332, 347 (6th Cir. 2023) (holding that the district

court could have weighed the factors such that one of the Daubert factors was outweighed by the other three).

So, on balance, all factors weigh in favor of admitting Dr. Singh to testify as to the Five Scientific Literature Features, but only factors (1) and (4)—testability and general acceptance within the scientific community—weigh in favor of admitting the Three Non-Scientific Literature factors.

Therefore, the Court will admit Dr. Singh's testimony insofar as it pertains to the Five Scientific Literature Features—(1) spectral tilt, (2) the three modulation characteristics, (3) fundamental frequency values and variations between voiced sounds, (4) spectral peaks across the same phonemes; formant positions and bandwidths, and (5) the automated model—but limit her from testifying as to the Three Non-Scientific Literature Features—(1) the Hammarberg Index, (2) distribution of the energy of the harmonics of phonated sounds, and (3) slope of the second formant.

## 6. Rule 403

Finally, even relevant evidence must be excluded "if its probative value is substantially outweighed" by a danger of unfair prejudice, confusion of the issues, misleading of the jury, undue delay, wasting time, or the needless presentation of cumulative evidence. FED. R. EVID. 403. But Defendant did not advance any reason for excluding Dr. Singh's testimony under Rule 403. *See generally* ECF No. 33. And the Court finds that Dr. Singh's testimony is very probative of the issue of whether Defendant was the one to make the hoax calls. While her testimony is complex, it is not so complex as to mislead the jury, particularly given the jury's benefit of cross-examination. Therefore, this Court finds no Rule 403 basis to exclude Dr. Singh's testimony in the limited manner the Court has outlined.

**IV.**

Accordingly, it is **ORDERED** that Defendant's Motion *in Limine,* ECF No. 33, is **DENIED IN PART** and **GRANTED IN PART.**

Further, it is **ORDERED** that Dr. Singh is **PERMITTED** to testify as to the Five Scientific Literature Features—(1) spectral tilt, (2) the three modulation characteristics, (3) fundamental frequency values and variations between voiced sounds, (4) spectral peaks across the same phonemes; formant positions and bandwidths, and (5) the automated model.

Further, it is **ORDERED** that Dr. Singh is **PRECLUDED** from testifying as to the Three Non-Scientific Literature Features—(1) the Hammarberg Index, (2) distribution of the energy of the harmonics of phonated sounds, and (3) slope of the second formant.

**This is not a final order and does not close this case.**

Dated: January 29, 2026                          s/Thomas L. Ludington
                                                 THOMAS L. LUDINGTON
                                                 United States District Judge